SHELL OIL COMPANY, Appellee and Cross–Appellant,

v.

HUTTENBAUER LAND COMPANY, INC. et al., Appellants and Cross–Appellees.

[Cite as *Shell Oil Co. v. Huttenbauer Land Co.* (1997), 118 Ohio App.3d 714.]

Court of Appeals of Ohio,
First District, Hamilton County.

Nos. C–959596, C–950624 and C–950636.

Decided March 19, 1997.

*Cohen, Todd, Kite & Stanford* and *Michael R. Schmidt,* for appellee and cross-appellant.

*Frost & Jacobs* and *Richard M. Goehler,* for appellant and cross-appellee Huttenbauer Land Company, Inc.

*Keating, Muething & Klekamp* and *James R. Matthews,* for appellant and cross-appellee Plaza Venture I, Ltd.

MARIANNA BROWN BETTMAN, Presiding Judge.

This is the second appeal of this case, which involves an interpretation of several lease documents. The parties involved are Shell Oil Company ("Shell"), Plaza Venture I, Ltd. ("Plaza"), and Huttenbauer Land Company ("HLC").

## BACKGROUND AND PERTINENT LEASE PROVISIONS

In 1952, Shell entered into a five-year lease with the Greenhills Home Owners Corporation ("Greenhills") for a commercial building lot in Hamilton County. First Fienco, Inc. ("Fienco"), then Plaza, then HLC, became successors in interest to Greenhills as lessors. On that lot, Shell, as lessee, operated a service station to sell gasoline and to repair cars.

In Article 4 of the original lease ("1952 lease"), Shell was granted a right of first refusal to renew the lease for an additional five years. The rent for this period was to be either (1) on the same basis as the best bona fide offer received

by lessor at that time, and/or (2) as then mutually agreed between the parties (Shell and lessor). The amount of the rent, addressed in Article 5 of the 1952 lease, was a gallonage charge plus a base minimum amount.[1]

Over the years, the parties negotiated and renewed a series of lease options, amendments, and extensions.

When the parties negotiated the 1965 "Agreement Amending and Extending Lease," a new provision was added, which was numbered Article 5–A,[2] and titled "Lease And/Or Purchase Refusal." This provision gave Shell an option in the event that the lessor decided to sell or lease the station to a third party.[3]

The 1969 lease was the last one negotiated. This lease was for six five-year terms. The amount of the rent appears in an unnumbered paragraph titled "Rent." While Shell took on certain new responsibilities under the 1969 lease, the gallonage charge and minimum rental remained unchanged.

In 1988, when Shell exercised its option a fourth time, HLC notified Shell that according to Article 4 of the 1952 lease, Shell's extension must be on the same basis as the best bona fide offer received by HLC and/or as then mutually agreed between the parties. According to A.W. Hirshberg, Vice–President of HLC, the rent was not up to current economic values. He wanted to change that and to arrive at an agreement with Shell to bring the rent up to the current standards.

HLC and Shell then entered into discussions and attempted to negotiate regarding the rental terms. However, HLC and Shell were unable to come to

---

1. In the original 1952 Lease, the gallonage charge was one and one-half cents per gallon delivered to the station, but not less than $335 per month. This gallonage formula remained the same from 1952 until the time of this dispute, except that a deposit due on the first of the month was added in 1965 and increased in 1969.

2. Article 5–A Lease and/or Purchase Refusal reads:
   "If at any time during Shell's tenancy of the premises leased herein, Lessor receives from a ready, willing and able purchaser, or lessee, an acceptable bona fide offer to purchase or lease, or makes a bona fide offer to sell or lease to such a purchaser or lessee, these premises, (or any other premises that Lessor presently owns in Greenhills for new service station development): Lessor shall give Shell notice, specifying the name and address of the purchaser or lessee (as the case may be) and the price and the terms of the offer, accompanied by Lessor's affidavit that the proposed offer is in good faith. Shell shall thereupon have the prior option to purchase or lease the premises covered by such offer, at the price and on the terms of the offer (subject to title satisfactory to Shell), which option Shell may exercise by giving Lessor notice within forty-five (45) days after Shell's receipt of Lessor's notice of the offer. Shell's failure at any time to exercise its option under this article (5–A) shall not affect this lease or the continuance of Shell's rights and options under this article or any other article of the lease."

3. This provision was in fact invoked when Plaza decided to sell to HLC. Shell declined to meet HLC's purchase offer.

any agreement, and in June 1988, HLC notified Shell that it was terminating the lease upon the expiration of the present term in August 1988.

Around the same time, HLC began exploring alternative leasing opportunities and received a third-party offer from Hamilton Oil to lease the station for a flat monthly rental of $3,500 per month ("Hamilton Oil offer"). Subsequently, HLC demanded that Shell meet the terms of that offer or vacate the premises. Shell refused and filed a declaratory judgment action, asking the trial court to declare that it had properly renewed the option and that its rent should be unchanged. HLC brought its own claim for declaratory relief, asking the court to determine that any renewal by Shell could only be on the same terms as the best bona fide offer received by HLC and/or as then mutually agreed upon between the parties.

In the first round of this case, the trial court granted summary judgment to HLC, ruling that if Shell was to remain a tenant, it must pay rent equal to the third-party offer. This court reversed that ruling, holding that the leases and option renewal documents were susceptible of two different interpretations, and that summary judgment was inappropriate.

The cause was remanded for a factual determination about whether Shell was obliged to meet a bona fide third-party offer in exercising the fourth of its six five-year options under the 1969 lease amendment. *Shell v. Huttenbauer Land Co.* (Mar. 31, 1993), Hamilton App. No. C–910835, unreported, 1993 WL 129835 ("*Shell I*").

## TRIAL

On remand, a bench trial was held. In addition to the factual dispute remanded by this court in *Shell I*, other issues were tried. Those that are the subject of this appeal are HLC's claim for damages for Shell's failure to maintain the premises and Plaza's claim for environmental-expense reimbursement.

The trial court found that Shell had properly exercised its option to renew the lease, and awarded rent, which sum included prejudgment interest, to Plaza and to HLC.[4] The amount of the rent was calculated under the gallonage provision, not the "meet best offer" provision. The trial court also dismissed HLC's counterclaim against Shell for failure to maintain the premises. Finally, the trial court awarded Plaza $10,617.86 in damages for reimbursement of environmental expenses, but declined to award prejudgment interest on these damages.[5] All

---

**4.** Plaza was awarded rent from January 1990 through October 1992 in the amount of $42,917.85. HLC was awarded rent from November 1992 through May 1995 in the amount of $31,583.46. Both awards included prejudgment interest.

**5.** The court also awarded real estate taxes to Plaza in the amount of $5,899.20, plus interest in the amount of $4,345.26, for a total of $10,244.46. No one disputes that part of the judgment.

awards were subject to postjudgment interest at ten percent from May 15, 1995, which no one disputes. Final judgment was entered accordingly. Everyone appealed.

In appeal No. C–950596, HLC challenges the calculation of rent based on a gallonage rather than a "meet best offer" theory, and the dismissal of its counterclaim for failure to maintain the premises. In cross-appeal No. C–950624, Shell disagrees with the inclusion of prejudgment interest in the rent awards. In appeal No. C–950636, Plaza challenges the failure to award prejudgment interest on its environmental claim. For each of these appeals, we shall consider each argument in turn.

## HLC APPEAL

## CALCULATION OF RENT

We will begin with HLC's appeal challenging the basis of the court's rent calculation, which HLC argues was against the weight and sufficiency of the evidence and was contrary to law.

In its first assignment of error, HLC argues that the trial court erred in calculating rent on the basis of the gallonage rather than the "meet best offer" theory. In other words, HLC argues that the trial court incorrectly decided the factual issue remanded by this court in *Shell I.*

The gravamen of HLC's argument is that each lease extension, 1956, 1965 and 1969, contained a similar provision that the lease was "on the same covenants and conditions as provided in the lease as heretofore amended, extended or supplemented," and thus the "meet best offer" requirement found in Article 4 of the 1952 lease was carried forward into the 1969 lease by those covenants. Relatedly, HLC argues that the 1952 lease also provided in Paragraph 15 that there would be no waiver by the lessor of any provision unless in writing and signed by the lessor, and that the lessor has never waived Article 4. Thus, according to HLC, Article 4 survived all of the amendments and Shell was obligated to meet the Hamilton Oil offer.

In support of its argument that the 1952 lease "meet best offer" provision was carried forward to all subsequent leases, HLC also relies on the fact that each time Shell renewed a lease term, it sent the lessor a letter containing the following language, or its equivalent:

"Reference is made (a) to the Lease dated August 12, 1952, as supplemented and amended, between you as Lessor and us * * * and (b) to our options under Article 4 thereof to extend the Lease for 6 additional periods of 5 years each."

Shell argues that Article 4's "meet best offer" provision in the 1952 lease expired when the parties renegotiated the 1969 lease. In support of its position, Shell points to the testimony of three witnesses on this point: Terry Heiden, Robert Woodworth; and Walter Lundwall. Heiden was the Shell real estate representative who negotiated the 1969 lease amendments. His testimony was that it was his job to get as many five-year renewals as possible for Shell at the most favorable terms possible. He testified expressly that there was no intention to carry forward the "meet best offer" provision from the 1952 lease to the 1969 amendments.

Robert Woodworth, who was Shell's District Manager, testified that each lease extension stood on its own feet and that the 1969 amendment had six five-year renewal options with the rent solely as stated in that agreement. Woodworth testified that it was his understanding that the term provision in the 1969 amendment effectively replaced the original term provision in the 1952 lease, which was Article 4.

Finally, Walter Lundwall, who was also a Shell real estate representative, testified that when any article in a lease was amended, the old article was gone: "It was dead." Therefore, Lundwall testified, Article 4 had been amended and replaced by the new term clause in the 1969 amendment.

In addition to the testimony from Shell employees, Shell relies on a January 1984 letter to Shell from Fienco, one of HLC's predecessors in interest. Although the letter addresses responsibility for repairs under the 1969 lease amendment, it also states that "this [1969] amendment is also responsible for the current set of rental option periods and rent payment methods."

On the subject of the Hamilton Oil offer, the deposition testimony of Thomas Williams, then president of Hamilton Oil, was offered below by agreement of both sides. At one point Williams testified that the offer was firm and his company was ready, willing, and able to proceed. However, elsewhere in his deposition, he disclosed that Hamilton Oil did not operate any retail gas stations. Williams testified that Hamilton Oil neither owned nor leased any facilities, but was simply a supplier. Finally, Williams stated that a new entity would have to be formed as lessor of the gas station so that Hamilton Oil would not be encumbered with any obligation or responsibility besides that of a supplier.

██ The trial court had broad discretion to determine the credibility of witnesses and the weight to be given the evidence. *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus. After hearing all of the evidence, the trial court did not completely adopt the position espoused by either side.

■ First, the court determined that Article 4 of the 1952 lease was clarified and superseded by Article 5–A in the 1965 lease. Because Article 5–A has its own meet-best-offer language, which the court apparently construed as similar to the provision in Article 4, the court also made a finding that the $3,500 per month flat-rent, third-party offer from Hamilton Oil was not a bona fide offer. The court thus concluded that Shell properly renewed the lease under the 1969 amendments and therefore still owed rent under the gallonage theory. Both findings are supported by competent, credible evidence and will not be disturbed on appeal. *Myers v. Garson* (1993), 66 Ohio St.3d 610, 614 N.E.2d 742; *Seasons Coal Co., Inc. v. Cleveland* (1984), 10 Ohio St.3d 77, 10 OBR 408, 461 N.E.2d 1273. Thus, we find no error in the court's interpretation of the lease provisions, and we therefore overrule HLC's first assignment of error in appeal No. C–950596.

## HLC APPEAL

### FAILURE TO MAINTAIN PREMISES

Next in logic is HLC's second assignment of error in appeal No. C–950596, that the trial court erred in dismissing its counterclaim under the lease for Shell's failure to maintain the premises.[6] HLC argues that because the cardinal rule of the law of damages requires that the injured party be fully compensated in order to be made whole, it is entitled to the reasonable cost of restoration. HLC presented unrefuted evidence that the cost to repair and restore the gas station was $58,718.

The syllabus law on this question is found in paragraph five of *Ohio Collieries Co. v. Cocke* (1923), 107 Ohio St. 238, 140 N.E. 356, which holds:

■ "If restoration can be made, the measure of damages is the reasonable cost of restoration, plus the reasonable value of the loss of the use of the property between the time of the injury and the restoration, *unless* such cost of restoration exceeds the difference in the market value of the property as a whole before and after the injury, in which case the difference in the market value before and after the injury becomes the measure." (Emphasis added.)

■ While this rule has been criticized as unduly harsh, and strayed from upon occasion, it is still the general rule for commercial property. Under the rule, restoration costs are permitted unless they exceed the difference in fair market value before and after the damages.[7] For an excellent discussion of this area of

---

6. This was Count VII of HLC's second amended counterclaim.

7. Even in those cases that permit restoration costs as the measure of damages (almost all of which involve residential rather than commercial property), we find persuasive the test

the law of damages, including an analysis of the Restatement of the Law 2d, Torts (1979), Section 929, on which HLC relies, see *Reeser v. Weaver Bros., Inc.* (1992), 78 Ohio App.3d 681, 686–692, 605 N.E.2d 1271, 1274–1278.

■ We hold that while HLC did present evidence of the cost to repair its property, the failure to present any evidence of the fair market value of the property before and after it was closed by Shell and allowed to fall into disrepair was fatal to its counterclaim. Without this information, the court simply could not apply the test required in *Ohio Collieries*. The trial court did not err in granting a dismissal of this counterclaim. HLC's second assignment of error is overruled.

## SHELL CROSS–APPEAL

## PLAZA APPEAL

## PREJUDGMENT INTEREST

Shell's sole assignment of error in its cross-appeal No. C–950624, is that the trial court erred in awarding prejudgment interest on the rent claims. Shell argues that where the terms of a contract are in dispute and the amount cannot be ascertained by mere reference to the contract, the amount due is unliquidated, and prejudgment interest cannot be awarded on unliquidated claims.

Prior to 1995, the decision to award prejudgment interest, pursuant to R.C. 1343.03(A), on a contract claim or on other written instruments was routinely determined by using the liquidated/unliquidated/capable-of-ascertainment-by-mere-calculation tests apparently articulated in *Braverman v. Spriggs* (1980), 68 Ohio App.2d 58, 22 O.O.3d 47, 426 N.E.2d 526 (liquidated/unliquidated) and *Shaker Sav. Assn. v. Greenwood Village, Inc.* (1982), 7 Ohio App.3d 141, 7 OBR 184, 454 N.E.2d 984 (unliquidated but capable of ascertainment).

In *Royal Elec. Constr. v. Ohio State Univ.* (1995), 73 Ohio St.3d 110, 652 N.E.2d 687, the Supreme Court visited the issue of prejudgment interest on certain construction contracts where there were delays occasioned by the state. Because the state was involved, this issue arose in the Court of Claims and was governed by R.C. 2743.18(A), which allows for an award of prejudgment interest against the state. While the syllabus is specific to a breach-of-contract claim involving the state, the liquidated/unliquidated/capable-of-ascertainment tests for awarding prejudgment interest are expressly repudiated, not only for claims

---

suggested in *Thatcher v. Lane Constr. Co.* (1970), 21 Ohio App.2d 41, 50 O.O.2d 95, 254 N.E.2d 703, which requires the establishment of the fair-market-value differential in order to determine whether restoration costs are reasonable.

governed by R.C. 2743.18(A), but also for those governed by R.C. 1343.03(A), the applicable statute in this case.[8]

As noted by the Supreme Court, the words "liquidated" and "unliquidated" simply are not in the statute, and being appropriately deferential to the legislature, the court declined to add them.

■ In rejecting these tests, the court held that "in determining whether to award prejudgment interest pursuant to R.C. 2743.18(A) and 1343.03(A), a court need only ask one question: Has the aggrieved party been fully compensated?" 73 Ohio St.3d at 116, 652 N.E.2d at 692.

Shell cites no case after *Royal Elec.* to sustain its position that because this is an unliquidated claim, prejudgment interest should not be allowed. We reject this analysis on the authority of *Royal Elec.* See *Young v. Internatl. Bhd. of Locomotive Engineers* (1996), 114 Ohio App.3d 499, 683 N.E.2d 420; *Cincinnati Ins. Co. v. Continental Cas. Co.* (Dec. 6, 1995), Hamilton App. Nos. C–940884 and C–940890, unreported, 1995 WL 714262. To the extent that any of our previous cases used the liquidated/unliquidated/capable-of-ascertainment tests to decide whether to award prejudgment interest, under R.C. 1343.03(A), they are no longer good law.

We thus hold, pursuant to *Royal Elec.*, that on the issue of whether to award prejudgment interest pursuant to R.C. 1343.03(A), and specifically on the rent claims in this case, the test to be applied is whether the aggrieved party has been fully compensated.

■ *Royal Elec.* also holds that the award of prejudgment interest is compensation for the period of time between the accrual of the claim and judgment. *Id.* at syllabus. The trial court found that rent was owed under the gallonage theory. The trial court further found that Shell was delinquent in its rental payments to Plaza from January 1990 through October 1992 and then delinquent in its rental payments to HLC from November 1992 through May 1995. Thus, in awarding prejudgment interest to Plaza and to HLC on the rent claims, the trial court has properly fully compensated them. Shell's assignment of error is overruled.

---

8. R.C. 1343.03(A) states:

"In cases other than those provided for in sections 1343.01 and 1343.02 of the Revised Code, when money becomes due and payable upon any bond, bill, note, or other instrument of writing, upon any book account, upon any settlement between parties, upon all verbal contracts entered into, and upon all judgments, decrees, and orders of any judicial tribunal for the payment of money arising out of tortious conduct or a contract or other transaction, the creditor is entitled to interest at the rate of ten per cent per annum, and no more, unless a written contract provides a different rate of interest in relation to the money that becomes due and payable, in which case the creditor is entitled to interest at the rate provided in that contract."

■ By exactly the same logic, however, Plaza is entitled to prejudgment interest on its environmental-remediation expenses, which arose from a contractual obligation of Shell. Therefore, Plaza's sole assignment of error in appeal No. C–950636, that the trial court erred in failing to award prejudgment interest on this sum, is sustained.

In summary, both of HLC's assignments of error in appeal No. C–950596 are overruled. Shell's sole assignment of error in cross-appeal No. C–950624 is overruled. Plaza's sole assignment of error in appeal No. C–950636 is sustained.

The judgment of the court of common pleas is affirmed in part and reversed in part, and this matter is remanded solely for a determination of the amount of prejudgment interest owed to Plaza on its claim for environmental expenses.

*Judgment accordingly.*

HILDEBRANDT and GORMAN, JJ., concur.