UNITED STATES PLAYING CARD COMPANY, Plaintiff–Appellant,

v.

THE BICYCLE CLUB, Defendant–Appellee.

[Cite as *United States Playing Card Co. v. The Bicycle Club* (1997), 119 Ohio App.3d 597.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–960265.

Decided May 21, 1997.

598

*Dinsmore & Shohl, Lynda E. Roesch, Lawrence R. Elleman* and *Patricia B. Hogan,* for appellant.

*Frost & Jacobs* and *David E. Schmit,* for appellee.

PAINTER, Presiding Judge.

The United States Playing Card Company ("USPC"), headquartered in Norwood, Ohio, has made "Bicycle" brand playing cards for over a century. USPC has one of the oldest registered trademarks in the United States—the Bicycle name.

The Bicycle Club ("the Club") is a card casino, established in 1984, located in Bell Gardens, California. The Club registered its name on the principal register in the United States Patent and Trademark Office on February 17, 1987. The Club is permitted under California law to play certain types of card games involving skill. The casino does not take the usual "house" position, but instead provides facilities for a time-based or per-hand fee, and the players compete among themselves for the "pot." With over one hundred and twenty tables at the time it opened, the Club billed itself as the largest card club casino in the world.

Before the opening of the Club in November 1984, either USPC President Lee Racey or Whitney Miller, in charge of retail sales at USPC, sent sales representative Herbert Craig to this new card casino. Craig visited George Hardie, then a partner and general manager of the Club, to attempt to sell cards to the Club. Hardie asked Craig if there would be a problem with the name of the Club. When Craig brought the issue up with USPC President Racey, Racey told Craig that the Club's name was an excellent way to promote the Bicycle name. Prior to the filing of this lawsuit in 1987, USPC never complained about the use of the Club's name. Further, Hardie testified, as Craig did, that he was told by a USPC representative that USPC's lawyers said the word "bicycle" was generic, and thus that USPC had no problem with the Club's name. USPC denies that its lawyers would label the Bicycle name generic, and claims that it tacitly gave the Club an "implied license" to use its name. In spite of this alleged *sub silentio* grant of an "implied license," at that time the Club bought its cards from a different supplier.

The Club spent $200,000 on a large sign bearing its name, $250,000 on its first order of poker chips, embossed with its name, and placed its name on various gift shop items, such as T-shirts, hats, coffee mugs, and the like. The Club advertised its casino services in numerous magazines and newspapers. Findings

from a study commissioned by the Club, in preparation for this litigation, showed that thirty-eight percent of Los Angeles area residents recognized the Bicycle Club name and which services it provided. Though evidence was presented of possible confusion on the part of some survey participants because of the Bombay Bicycle Club and the Bicycle Cafe, both restaurants in Los Angeles (and presumably not sued by USPC), undoubtedly the casino was recognized by a great number of people in the Los Angeles area.

In 1986, the Club decided to try USPC's cards, and the parties negotiated a contract, under which USPC would provide special decks of "pan" cards, used in panguinne, similar to gin rummy, and super pan nine, a popular Asian card game. These cards bore the logo "Bicycle Club." After receiving only about one-third of the cards, the Club complained of defective cards and card shortages, seemingly related to a labor strike then occurring at USPC. On July 29, 1987, Hardie wrote a letter to USPC repudiating the remainder of the contract because of problems with card quality. On October 7, 1987, USPC brought this suit claiming breach of contract, and violation of its statutory and common-law rights in the Bicycle trademark.

In 1990, the federal government took a majority interest in the general partner of the limited partnership comprising the Club, a joint venture, in a forfeiture proceeding after several principals in the partnership were convicted of violations of the Racketeer Influenced and Corrupt Organizations ("RICO") statute. USPC wished to introduce, under a trademark-dilution theory, evidence of adverse publicity about the Club during this time, including articles and letters in The Wall Street Journal and The Los Angeles Times, and stories on the Dallas Morning News, CBS Evening News, and NBC Sunrise, as proof of tarnishment of the Bicycle trademark. Prior to trial, the trial court, without written explanation, granted the Club's motions to exclude the evidence regarding its reported unlawful activities. During trial, the trial court denied USPC's motion for reconsideration concerning the admissibility of this evidence, finding its prejudicial effect outweighed its probative value under Evid.R. 403.

After over eight years of delay, the case was heard on January 16, 1996. Apparently by sheer coincidence, the first day of trial was the day that the Federal Trademark Dilution Act of 1995 ("FTDA") went into effect. However, neither side mentioned this statute at trial. On appeal, the Club contends that this statute is a bar to USPC's claim of trademark dilution.

The trial court used an advisory jury for the contract claim and, after rejecting the jury's initial verdict, accepted its second, which awarded $8,218 to USPC. The advisory jury's first verdict in favor of USPC was for $15,643.92 in damages, but it also ordered USPC to give the Club its inventory of finished pan cards. Rather than force USPC to perform, the trial court correctly had the jury further deliberate and convert its original verdict into a purely monetary award. Howev-

er, the trial court refused to award prejudgment interest on the breach-of-contract award. Further, the trial court ruled against USPC on "all issues involving common law and statutory trademark infringement, dilution and unfair competition," and declined to enjoin the Club's use of its name.

USPC brings two assignments of error, challenging (1) the trial court's refusal to admit reputation evidence bearing on trademark dilution, and (2) the trial court's denial of prejudgment interest on the breach-of-contract award.

## I. Immunity

■ Before reaching USPC's assignments, we first reject the Club's assertion that it is immune from this lawsuit because the United States government has a partnership interest in it. Upon receiving its partnership interest from a RICO forfeiture action, the United States became an owner of this gaming establishment. Bizarre perhaps, but no more so than the federal government's acquisition of an interest in the Mustang Ranch, a legal brothel in Nevada. See *Conforte v. United States* (D.Nev.1991), 125 B.R. 287.[1] However, the United States does not receive sovereign immunity when acting in such a capacity; granting the United States immunity as a casino (or brothel) operator would be ludicrous.

Although the United States allegedly acquired its interest in 1990, no immunity claim was made in the trial court. No United States Attorney has appeared, and we are not certain that the United States Government even *claims* immunity. Be that as it may, we do not believe that governmental immunity applies in this case.

■ To determine whether the government is entitled to sovereign immunity, the threshold question is whether the suit is one against the United States as sovereign. *Florida Dept. of Business Regulation v. United States Dept. of Interior* (C.A.11, 1985), 768 F.2d 1248. "When the United States enters into commercial business it abandons its sovereign capacity and is to be treated like any other corporation." *Salas v. United States* (C.A.2, 1916), 234 F. 842, 844, citing *Bank of United States v. Planters' Bank of Georgia* (1824), 22 U.S. (9 Wheat.) 904, 6 L.Ed. 244.[2] The suit against the Club is not a suit against the United States in its sovereign capacity.[3] Therefore, we retain jurisdiction over this action against the Club.

---

1. It should be noted that at the time the IRS seized the Mustang brothel, it was not a "going business," and the IRS made no effort to operate the brothel.

2. See, *e.g., Gould Coupler Co. v. United States Shipping Bd. Emergency Fleet Corp.* (S.D.N.Y. 1919), 261 F. 716; *Keifer & Keifer v. Reconstr. Fin. Corp.* (1939), 306 U.S. 381, 59 S.Ct. 516, 83 L.Ed. 784; *Langer v. United States* (C.A.8, 1935), 76 F.2d 817.

3. Cf. *Lebron v. Natl. RR. Passenger Corp.* (1995), 513 U.S. 374, 115 S.Ct. 961, 130 L.Ed.2d 902; *Mendrala v. Crown Mtge. Co.* (C.A.7, 1992), 955 F.2d 1132; *Hall v. Am. Natl. Red Cross* (C.A.9, 1996), 86 F.3d 919.

## II.  Trademark Dilution

In USPC's first assignment of error, it claims that the trial court erred by excluding evidence of the Club's reputation to support USPC's claim for dilution of the Bicycle trademark.  After considering issues of laches and estoppel, we hold that USPC cannot assert trademark dilution against the Club. Therefore, any possible error by the trial court in excluding evidence in a trademark-dilution action is moot.  The first assignment is overruled.

■  USPC's cause of action is brought under a theory of trademark dilution, grounded in Ohio common law.  Trademark dilution is "the 'gradual whittling away' of a trademark's distinctiveness through use by third parties on nonconfusing, noncompeting products."  Schechter, The Rational Basis of Trademark Protection (1927), 40 Harv.L.Rev. 813, 825.[4]  Trademark dilution protects a trademark owner against the diminution of a trademark's "commercial magnetism" or selling power by a junior user's unauthorized use of the same or substantially similar mark.  See Pattishall, Dawning Acceptance of the Dilution Rationale for Trademark–Trade Identity Protection (1984), 74 Trademark Rep. 289, 290.[5]

### Estoppel by Laches and Acquiescence

In a trademark dilution or infringement context, estoppel is closely related to laches.  Professor McCarthy refers to "estoppel by laches" and "estoppel by acquiescence" in his treatise on trademarks.  4 McCarthy on Trademarks and Unfair Competition (3 Ed.1996), 30.01–30.03. Keeping this nexus in mind, we analyze laches and estoppel as they apply to this case.

■  The equitable doctrine of laches requires "(1) unreasonable delay or lapse of time in asserting a right, (2) absence of an excuse for such delay, (3) knowledge, actual or constructive, of the injury or wrong, and (4) prejudice to the other party."  *State ex rel. Meyers v. Columbus* (1995), 71 Ohio St.3d 603, 605, 646 N.E.2d 173, 174, quoting *State ex rel. Cater v. N. Olmsted* (1994), 69 Ohio St.3d 315, 325, 631 N.E.2d 1048, 1056.[6]  The statute of limitations applicable to analogous actions at law is used to create a "presumption of laches."  *Kaufman v. Limobusters, Inc.* (1992), 76 Ohio App.3d 87, 89, 600 N.E.2d 1149, 1150.  An

---

4.  See, *e.g.*, *Mead Data Cent., Inc. v. Toyota Motor Sales, U.S.A., Inc.* (C.A.2, 1989), 875 F.2d 1026.

5.  See *Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.* (1942), 316 U.S. 203, 205, 62 S.Ct. 1022, 1024, 86 L.Ed. 1381, 1384–1385.

6.  See, also, *Univ. of Pittsburgh v. Champion Products, Inc.* (C.A.3, 1982), 686 F.2d 1040; *Guardian Life Ins. Co. of Am. v. Am. Guardian Life Assur. Co.* (E.D.Pa.1996), 943 F.Supp. 509.

action is presumed to be barred if the statute of limitations expires before suit is brought. *Id.*, citing *Tandy Corp. v. Malone & Hyde, Inc.* (C.A.6, 1985), 769 F.2d 362, and *SCI Sys., Inc. v. Solidstate Controls, Inc.* (S.D.Ohio 1990), 748 F.Supp. 1257. The analogous Ohio law for trademark infringement and dilution is a two-year statute of limitations for injury to personal property under R.C. 2305.10. See *id.; Ameritech, Inc. v. Am. Information Technologies Corp.* (C.A.6, 1987), 811 F.2d 960.

■ In *Kaufman,* the court held that laches applied where a lawsuit for trademark infringement was not brought for four years, even though the plaintiff complained through a series of letters to the infringer concerning the trademark.[7] Here, USPC did not bring suit for nearly three years after the opening of the Club, on November 30, 1984, and knew about the casino even before it opened. USPC never even complained to the Club about its name until the filing of the lawsuit on October 7, 1987. USPC's inaction, well longer than the analogous statute of limitations, constitutes an unreasonable delay.

■ Prejudice, however, will not be inferred from a mere lapse of time. *State ex rel. Meyers v. Columbus,* 71 Ohio St.3d at 605, 646 N.E.2d at 174, citing *State ex rel. Chavis v. Sycamore City School Dist. Bd. of Edn.* (1994), 71 Ohio St.3d 26, 641 N.E.2d 188. During the period of USPC's acquiescence, the Club spent money on signs, poker chips, various gift shop items, and advertising. The Club established a recognized name in the card casino industry. To forgive USPC's delay in bringing suit would materially prejudice the Club. We therefore hold that USPC's delay constituted laches.

■ But where the remedy desired is prospective relief, a finding of laches alone is not sufficient. See *Kaufman v. Limobusters, Inc.*, 76 Ohio App.3d at 89, 600 N.E.2d at 1151, citing *Tandy Corp v. Malone & Hyde, Inc.* (C.A.6, 1985), 769 F.2d 362. " 'To defeat a suit for injunctive relief, a defendant must also prove elements of estoppel which requires more than a showing of mere silence on the part of a plaintiff; defendant must show that it had been misled by plaintiff through actual misrepresentations, affirmative acts of misconduct, intentional misleading silence, or conduct amounting to virtual abandonment of the trademark.' " *Id.*, quoting *SCI Sys., Inc. v. Solidstate Controls, Inc.*, 748 F.Supp. at 1262. Therefore, to foreclose the possibility of injunctive relief, the Club must use estoppel as a shield.

---

7. See, also, *Georgia–Pacific Corp. v. Great Plains Bag Co.* (C.C.P.A.1980), 614 F.2d 757; *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.* (Fed.Cir.1992), 960 F.2d 1020; *GTE Corp. v. Williams* (D.Utah 1986), 649 F.Supp. 164; *Univ. of Pittsburgh v. Champion Products, Inc.* (C.A.3, 1982), 686 F.2d 1040.

■ Estoppel arises when one by his acts, representations, or admissions, or by his silence when he ought to speak out, intentionally or through culpable negligence induces another to believe certain facts to exist and such other rightfully relies and acts on such belief, so that he will be prejudiced if the former is permitted to deny the existence of such facts. *State ex rel. Madden v. Windham Exempted Village School Dist. Bd. of Edn.* (1989), 42 Ohio St.3d 86, 90, 537 N.E.2d 646, 649. [8]

■ In a trademark context, "[t]here is much semantic confusion in the case opinions over the distinction, if any, between 'laches,' 'estoppel by laches' and 'acquiescence.' * * * To preserve some semantic sanity in the law, it is appropriate to reserve the word 'acquiescence' for use only in those cases where the trademark owner, by affirmative word or deed, conveys its implied consent to another. That is, laches denotes a merely passive consent, while acquiescence implies active consent. In this set of definitions, we would have 'estoppel by laches' as distinct from 'estoppel by acquiescence.'" *Guardian Life Ins. Co. of Am. v. Am. Guardian Life Assurance Co.,* 943 F.Supp. at 519, quoting McCarthy on Trademarks and Unfair Competition, Section 31.14.

■ Hardie testified that Racey and Craig told him there was no problem with the Club's name. This testimony is supported by the uncontroverted fact that USPC did not complain about the Club's use of the name until it filed suit. Even if Hardie's testimony were disbelieved, if USPC objected to the Club's name, it had a duty to speak out—or it was at least guilty of intentionally misleading the Club through its silence. See *Emra Corp. v. Superclips Ltd.* (E.D.Mich.1983), 559 F.Supp. 705; *Conan Properties, Inc. v. Conans Pizza, Inc.* (C.A.5, 1985), 752 F.2d 145 (holding laches by acquiescence appropriate where owner of Conan Properties had sent autographed picture of himself in front of Conans Pizza restaurant along with "best wishes"). USPC cannot maintain an action for trademark dilution after it failed to speak out, all the while knowing about the Club and furthering the Club's name by producing cards bearing that name. See *Freedom S. & L. Assn. v. Way* (M.D.Fla.1984), 583 F.Supp. 544, affirmed (C.A.11, 1985), 757 F.2d 1176.

The Fourth Circuit refused to grant an injunction against use of the name "Ambrosia" because of "laches and acquiescence" by the plaintiff. *Ambrosia Chocolate Co. v. Ambrosia Cake Bakery, Inc.* (C.A.4, 1947), 165 F.2d 693, 695. In *Ambrosia Chocolate Co.,* a sales representative of the plaintiff chocolate company

---

**8.** See, also, *First Fed. S. & L. Assn. v. Perry's Landing, Inc.* (1983), 11 Ohio App.3d 135, 11 OBR 215, 463 N.E.2d 636; *In re Ohio Knife Corp.* (Oct. 21, 1992), Hamilton App. Nos. C–910482 and C–910488, unreported, 1992 WL 308365; *CVG Shops, Inc. v. Fifth Third Ctr. Assoc.* (Dec. 4, 1996), Hamilton App. No. C–960091, unreported, 1996 WL 691449.

tried to sell the defendant bakery ingredients for the latter's cakes. Persisting in attempts to sell ingredients to the bakery, the vice-president of the chocolate company noted in a letter to the bakery "[t]he fact that the name 'Ambrosia' of your company was the same as ours increased our interest, you may be sure." *Id.* at 694. Eight years later, the chocolate company sued to enjoin the bakery from using the Ambrosia name. During the eight years of acquiescence, the bakery built up a large and lucrative cake business. The court held that the chocolate company was estopped from destroying that business by an injunction that would forbid use of the name "Ambrosia."

Similarly, USPC knew of the Club's name choice before the Club opened in 1984. USPC sent Craig to solicit sales from the Club. USPC even considered investing in the Club. In 1986, the Club bought cards from USPC, which USPC produced inscribed with the Club's name. Apparently, newly hired USPC president Ron Rule became concerned with the Club's name in 1987, especially after the contract dispute between the parties could not be resolved, whereas Racey did not find the name objectionable during his tenure as president of USPC.

Meanwhile, prior to the filing of this suit, the Club registered its name on the principal register in 1987. USPC did not challenge this registration. The Club spent hundreds of thousands of dollars on signs, poker chips, and gift shop items bearing its name. The Club advertised in many magazines and newspapers for its casino services. The card club was the largest in the world, and undoubtedly built up recognition in the Los Angeles area, especially among its clientele— gamblers.

USPC cannot revoke an "implied license" after it allowed the Club to garner customer loyalty and recognition. The Club relied on USPC's consent to use the Bicycle Club name. Moreover, the Club would be damaged financially if it had to rename itself and change the name on its signs, poker chips, and gift shop items. USPC actively consented to the Club's name choice. After the Club relied on this consent, USPC should not be heard to object.

USPC claims that although it "tacitly" gave the Club an "implied license" to use its name, it had the right to revoke this license after the Club received negative publicity, which USPC claims adversely affected the Bicycle name. USPC cites cases for the proposition that such a change in circumstances warrants ignoring laches and estoppel. We are unpersuaded.

In *Parrot Jungle, Inc. v. Parrot Jungle, Inc.* (S.D.N.Y.1981), 512 F.Supp. 266, cited by USPC, the court held that laches would not apply although the plaintiff, a jungle-like tourist attraction in Florida, knew about the defendant, a pet store in New York, for years. When the pet store decided to franchise its stores

nationally, the plaintiff sued for trademark infringement. This change in circumstance was material because of the difference to the plaintiff between a single pet store in New York and a nationwide franchising of "Parrot Jungle" pet stores. The plaintiff may have been estopped from asserting an infringement or dilution suit against the single pet store, but was not estopped from bringing suit against a nationally franchised chain of the stores. See, also, *Univ. of Pittsburgh v. Champion Products, Inc.*, 686 F.2d 1040 (holding that laches did not bar an injunction where the defendant changed from modest local sales to national sales, capitalizing on a football team's emergence as a national power); *Tandy Corp. v. Malone & Hyde, Inc.*, 769 F.2d at 367 ("Tandy's failure to object to limited geographic use of a mark does not bar it from objecting later to widespread use of the mark."); *Conan Properties, Inc. v. Conans Pizza, Inc.*, 752 F.2d 145 (holding that laches barred injunction in Austin, Texas, but not in a larger geographical area); *SCI Sys., Inc. v. Solidstate Controls, Inc.*, 748 F.Supp. 1257 (making of material changes in mark by defendant that progressively encroaches on plaintiff's rights precludes use of laches).

In contrast, the Club opened as the largest card casino in the world. The principal change in circumstances alleged by USPC does not concern its size, but its reputation. USPC does allege that the Club's $9-million expansion in 1988–1989 is a change of circumstances barring the doctrine of laches. But USPC does not explain how such an expansion at the same location, where the Club was already a huge card casino, would have materially changed the situation concerning the name. Further, USPC cites no case as authority that a change in an infringer's reputation is cause to deny it the right to assert laches or estoppel. Although courts have denied a defense of laches where an infringer's conduct was egregious, the egregious conduct was directed at the plaintiff. The Sixth Circuit held that the defendant's misconduct in plagiarizing the plaintiff's patent was cause to reject its assertion of laches—an equitable defense only available in the interest of fairness. *TWM Mfg. Co. v. Dura Corp.* (C.A.6, 1979), 592 F.2d 346, affirmed in part and overruled in part (C.A.6, 1983), 722 F.2d 1261, affirmed (Fed.Cir.1986), 789 F.2d 895.[9] However, the egregious conduct cited by the Sixth Circuit was directed against the patent holder itself. In contrast, USPC complains not that the Club has acted egregiously towards it, but that the Club has just acted in a generally egregious manner.

USPC, by sleeping on its rights and courting the Club's business—even supplying it with playing cards bearing the name to which it now objects—has forfeited any right to complain. Allowing USPC to complain and enjoin the Club's name any time the Club's reputation becomes soiled would place it in a

---

9. See, also, *Anaconda Co. v. Metric Tool & Die Co.* (E.D.Pa.1980), 485 F.Supp. 410.

position of overseer—ready to sue on its name any time the Club did something to which USPC objected. USPC should have considered that the Club might one day provide inferior services or develop an unsavory reputation. But after USPC's acquiescence, the Club need not answer to USPC for the blemishes that it has received. We hold that the Club is shielded by estoppel by laches and estoppel by acquiescence barring USPC's trademark-dilution action.[10]

In holding USPC's dilution action barred by estoppel, we need not determine whether the FTDA operates retroactively. Nor do we need to consider whether trademark dilution is even part of Ohio's common law.[11]

### III. Prejudgment Interest

In USPC's second assignment of error, it asserts that the trial court erred by denying prejudgment interest for the breach-of-contract award. This assignment is well taken.

The advisory jury awarded USPC $8,218 on the breach of contract. The trial court accepted this verdict and granted postjudgment interest from the date of the filing of the entry, but denied prejudgment interest.

Prejudgment interest compensates a claimant for the period of time between the accrual of the claim and the judgment, regardless of whether the judgment is based on a liquidated or unliquidated claim. *Royal Elec. Constr. Corp. v. Ohio State Univ.* (1995), 73 Ohio St.3d 110, 652 N.E.2d 687, syllabus; *Cincinnati Ins. Co. v. Continental Cas. Co.* (Dec. 6, 1995), Hamilton App. Nos. C–940884 and C–940890, unreported, 1995 WL 714262.[12] The sole test to be used is what would make the prevailing party whole. *Royal Elec. Constr. Corp. v. Ohio State Univ.; Cincinnati Ins. Co. v. Continental Cas. Co.* (Painter, J., concurring).

---

**10.** The defense of "estoppel by acquiescence" may not be absolute. In a trademark-*infringement* case, the Eleventh Circuit held that a showing of "inevitable confusion" in the marketplace from dual use of a mark may revive a senior user's claim from estoppel to vindicate the public interest. *SunAmerica Corp. v. Sun Life Assur. Co.* (C.A.11, 1996), 77 F.3d 1325. However, in a dilution action, as here, confusion is not a necessary consideration. Further, USPC certainly did not show at trial that "inevitable confusion" would result from the use of the Bicycle Club name.

**11.** See *Ameritech, Inc. v. Am. Information Technologies Corp.; Natl. City Bank v. Natl. City Window Cleaning Co.* (1963), 174 Ohio St. 510, 23 O.O.2d 146, 190 N.E.2d 437; *Guild & Landis, Inc. v. Liles & Landis Liquidators, Inc.* (1959), 2 Ohio Misc. 169, 31 O.O.2d 433, 207 N.E.2d 798; but, see, *Worthington Foods, Inc. v. Kellogg Co.* (S.D.Ohio 1990), 732 F.Supp. 1417 (arguing that the Ohio cases cited in *Ameritech* were decided on traditional trademark-infringement analysis involving confusion).

**12.** See, also, *Bushelman Constr., Inc. v. Glacid Group, Inc.* (June 26, 1996), Hamilton App. Nos. C–950412 and C–950438, unreported, 1996 WL 348022; *Shell Oil Co. v. Huttenbauer Land Co.* (1997), 118 Ohio App.3d 714, 693 N.E.2d 1168.

R.C. 1343.03(A) grants interest at the rate of ten percent per annum from the time the money should have been paid.

The contract for the sale of cards was breached when, on July 29, 1987, Hardie wrote to USPC terminating the contract. At that point, the Club had only taken about one-third of the cards that it had ordered under the contract. This was a definite date that the contract was breached. That until that point neither party had enforced its rights under the contract is of no moment. USPC can be made whole by awarding prejudgment interest from the date of the breach until the date of the entry of judgment. The second assignment is sustained.

## IV.   Conclusion

USPC's trademark-dilution cause of action is barred by estoppel by acquiescence. Therefore, any error by the trial court concerning evidentiary issues of trademark dilution is moot. However, USPC is entitled to prejudgment interest on its breach-of-contract claim to make it whole. The prejudgment interest is to be calculated from the date of the breach until the date the judgment was entered. We therefore reverse that part of the trial court's judgment denying prejudgment interest, and remand this case to the trial court with instructions to calculate prejudgment interest and enter judgment accordingly. In all other respects, the judgment of the trial court is affirmed.

*Judgment affirmed.*

HILDEBRANDT and MARIANNA BROWN BETTMAN, JJ., concur.