DECISION AND JOURNAL ENTRY
{¶ 1} Appellants, Oatey Company, Inc. ("Oatey") and Gary Oatey ("Gary"),[1] appeal from judgments of the Medina County Court of Common Pleas that awarded damages and prejudgment interest to appellee, RPM, Inc. ("RPM"). We affirm in part and reverse in part.
 {¶ 2} This case has a lengthy history including two prior appeals to this court.[2] RPM filed a complaint against Oatey on October 25, 1996, alleging, among other things, misappropriation of trade secrets, breach of contract, and breach of fiduciary duty. Each of RPM's claims was premised on the same alleged facts. RPM alleged that it had owned a company named PCI, which was a manufacturer of solvent cements for PVC pipe. For many years, PCI held accounts to supply private label cement to several hardware co-operatives, which distributed products to Ace and True Value Hardware and other retail hardware franchises. The private label cement was packaged with the store's own private label or store brand. Oatey was also a manufacturer of PVC solvent cement and, although it supplied its own name-brand cement to Ace and True Value (through True Value's co-operative then known as Cotter and Company, hereinafter "Cotter"), Oatey had never been able to outbid PCI on the higher-volume, and thus more lucrative, private label accounts. Year after year, PCI had been able to retain a significant share of the private label cement market, despite the fact that it was a much smaller company than Oatey.
 {¶ 3} During 1994, Gary Oatey, chief executive officer of Oatey Company, approached Frank Sullivan, chief financial officer of RPM, and expressed an interest in purchasing PCI. Negotiations continued for several months and, during that time, Oatey was taken on a tour of the PCI factory and was given detailed financial information about the business. Before RPM disclosed any of this information to Oatey, it had required it to sign a confidentiality agreement, in which Oatey agreed that it would use the information "solely for the purpose of evaluating a possible acquisition of PCI." The agreement further provided that Oatey would disclose the information "only to those of your representatives who have a need to know for such purpose and who agree to keep such information confidential and to be bound by this Agreement." Negotiations between Oatey and RPM never culminated in a purchase of PCI and eventually came to an end.
 {¶ 4} Frank Sullivan began to suspect that Oatey had never been interested in purchasing PCI but that it had instead sought financial information about the company for competitive purposes. These suspicions arose after negotiations with Oatey were terminated and after Sullivan learned that Oatey had successfully outbid PCI for the Cotter private label cement account, an account that PCI had held for over two decades and which represented 28 percent of its business. It was RPM's position that Oatey had intentionally acquired PCI financial information for the purpose of using it to outbid PCI on the Cotter account. RPM maintained that the loss of the Cotter account caused a significant decrease in the value of PCI and that when RPM sold PCI to another buyer, it did so at a loss of $1.4 million.
 {¶ 5} This case eventually proceeded to a jury trial. The jury entered a verdict for RPM and against Oatey on RPM's claims for misappropriation of trade secrets, breach of fiduciary duty, and breach of contract. On RPM's other claims, the jury entered a verdict for Oatey. The jury found no damages on the misappropriation of trade secrets claim, but awarded RPM $210,000 in damages on the breach of fiduciary duty claim, and $210,000 in damages on the breach of contract claim.
 {¶ 6} Pursuant to the jury's verdicts, the trial court entered judgment for RPM in the amount of $420,000 plus post-judgment interest. The trial court later awarded RPM pre-judgment interest on the breach of contract claim. Oatey appealed and, after RPM raised concerns to the trial court that the transcript of proceedings included numerous transcription errors, the trial court ordered that "the transcript of proceedings in this matter be corrected and resubmitted to the Court of Appeals." No corrected transcript was ever filed, however, nor did either party file a statement of evidence pursuant to App.R. 9. Consequently, we concluded that there was not an adequate record to enable us to review the merits of most of the assignments of error and issued a decision to that effect. See RPM, Inc. v. Oatey Company, 9th Dist. No. 3282-M and 3289-M, 2003-Ohio-367.
 {¶ 7} Oatey appealed to the Ohio Supreme Court and, in a decision without opinion, the Supreme Court reversed and remanded the case, mandating that:
"the trial court's order to the court reporter to correct and resubmit the transcript on appeal, issued pursuant to App.R. 9(E), be carried out and that the court of appeals is to address the substantive issues of law raised in the assignments of error once it receives the full transcript."RPM, Inc. v. Oatey Co., 102 Ohio St.3d 1487, 2004-Ohio-3311.
 {¶ 8} On remand from the Ohio Supreme Court, the parties filed a corrected transcript. On the corrected record, we will now address the merits of Oatey's six assignments of error.
 ASSIGNMENT OF ERROR I
"The trial court erred by denying [Oatey's] motions for directed verdict."
 ASSIGNMENT OF ERROR II
"The trial court erred by denying [Oatey's] motion for judgment notwithstanding the verdict."
 {¶ 9} We will address the first two assignments of error together because they raise many common arguments. Oatey has asserted that the trial court erred in failing to grant it a directed verdict, or alternatively a judgment notwithstanding the verdict, for several reasons.
 {¶ 10} "The standard for granting a motion for judgment notwithstanding the verdict * * * pursuant to Civ. R. 50(B) is the same as that for granting a motion for a directed verdict pursuant to Civ. R. 50(A)." Texler v. D.O. Summers Cleaners Shirt Laundry Co. (1998),81 Ohio St.3d 677, 679, citing Wagner v. Roche Laboratories (1996),77 Ohio St.3d 116, 121, fn. 2. Civ.R. 50(A) authorizes the trial court to grant a directed verdict only when:
"after construing the evidence most strongly in favor of the party against whom the motion is directed, [it] finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue."
 {¶ 11} "[T]he court must neither consider the weight of the evidence nor the credibility of the witnesses in disposing of a directed verdict motion. * * * Thus, `if there is substantial competent evidence to support the party against whom the motion is made, upon which evidence reasonable minds might reach different conclusions, the motion must be denied.'" Strother v. Hutchinson (1981), 67 Ohio St.2d 282, 284-285, quoting Hawkins v. Ivy (1977), 50 Ohio St.2d 114, 115.
 {¶ 12} Each of RPM's claims was premised on the same allegations: that Gary Oatey had approached Frank Sullivan of RPM and indicated that he was interested in purchasing PCI; that Oatey never had any interest in purchasing PCI but had feigned an interest to enable it to acquire confidential financial information about PCI; that Oatey agreed to keep the information confidential and to use it only for purposes of evaluating the company as a potential acquisition; that Oatey in fact used the confidential information to compete with PCI in bidding on the Cotter private label solvent account; that by using the confidential information, Oatey was able to outbid PCI for the Cotter account; and that RPM was damaged as a result because it sold PCI for far less than it had been worth prior to the loss of the Cotter account.[3]
 {¶ 13} Because Oatey has raised different arguments on each of the three claims upon which RPM prevailed, we will address each claim separately.
 Misappropriation of Trade Secrets {¶ 14} Oatey contends that it should have been granted a directed verdict or a judgment notwithstanding the verdict on RPM's claim for misappropriation of trade secrets because, among other reasons, RPM did not establish that it owned the trade secrets at issue. The parties agreed that the confidential information at issue in this case constituted trade secrets. The only dispute at trial was whether RPM owned those trade secrets and whether Gary Oatey or the Oatey Company had misappropriated them.
 {¶ 15} The law in Ohio, as the jury was instructed without any objection from Oatey, is that to bring a claim for misappropriation of trade secrets, one must either own or have possession or a right to control the trade secrets and have taken active steps to maintain their secrecy. See Fred Siegel Co., L.P.A. v. Arter Hadden (1999),85 Ohio St.3d 171, 181. Oatey does not dispute that RPM took active steps to maintain the secrecy of PCI's financial information. There was ample evidence before the jury to demonstrate that, even if RPM did not directly own PCI and its trade secrets, it did have possession of and the right to control that information and to solicit a sale of the company. It was RPM that effectuated the eventual sale of PCI to another buyer.
 {¶ 16} Moreover, even if Oatey could demonstrate that the trial court had erred in failing to grant it a directed verdict on this claim, the error would not be reversible unless it also resulted in prejudice to Oatey. Collier v. Dorcik, 9th Dist. No. 03CA0103-M, 2004-Ohio-4062, citing App.R. 12(B) and Civ.R. 61. Oatey has failed to demonstrate any prejudice resulting from this alleged error. Although the jury found in favor of RPM and against the Oatey Company on RPM's claim for misappropriation of trade secrets, the jury awarded no damages on that claim. Given that RPM was awarded judgment against Oatey on other claims, no prejudice resulted to Oatey by a mere judgment against it on this claim without a corresponding award of damages. See DeMuesy v.Haimbaugh (Dec. 31, 1991), 10th Dist. No. 91AP-212 (holding that no prejudice resulted to defendant by erroneous finding that it breached a contract where no damages were awarded).
 {¶ 17} Consequently, because Oatey has failed to even argue, much less demonstrate, that it was prejudiced by the jury's verdict on this claim, it cannot establish reversible error in the trial court's failure to grant a directed verdict or judgment notwithstanding the verdict on RPM's claim for misappropriation of trade secrets.
 Breach of Fiduciary Relationship {¶ 18} Oatey also moved for a directed verdict on RPM's breach of fiduciary duty claim, contending that reasonable minds could only conclude that there was no fiduciary relationship between RPM and Oatey. RPM had maintained that, because it disclosed confidential information to Oatey and Oatey signed the confidentiality agreement, RPM reposed a special trust and confidence in Oatey and a fiduciary relationship was created. On the other hand, Oatey has asserted from the beginning that neither RPM's disclosure of confidential information nor the execution of the confidentiality agreement created a fiduciary relationship, as there was no mutual agreement to create such a relationship.
 {¶ 19} One does not owe a fiduciary duty to another absent proof of a fiduciary relationship, out of which the duties arise. In re Terminationof Employment (1974), 40 Ohio St.2d 107, 115. Ordinarily, in business transactions where the parties deal at arm's length, no fiduciary relationship exists. A unilateral understanding by RPM that Oatey owed it a fiduciary duty was insufficient to establish that a fiduciary relationship existed. Creative Hardwood Floors v. Schafer (Mar. 24, 1998), 5th Dist. No. 97-CA-56.
 {¶ 20} A fiduciary duty may arise out of a contract or an informal relationship, however, where both parties to the transaction understand that a special trust of confidence has been reposed. Blon v. Bank One,Akron, N.A. (1988), 35 Ohio St.3d 98, 101. "A `fiduciary relationship' is one in which special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust." In re Terminationof Employment (1974), 40 Ohio St.2d 107, 115. The burden of proving the existence of a fiduciary relationship is on the party asserting it.Craggett v. Adell Ins. Agency (1993), 92 Ohio App.3d 443, 451.
 {¶ 21} RPM asserts that a fiduciary relationship arose between RPM and Oatey both by virtue of a contract and through the parties' informal relationship. The contract to which RPM refers is the confidentiality agreement. Although a fiduciary relationship may arise contractually, RPM failed to point to any language in the confidentiality agreement, and we cannot find any, that even suggests that the parties mutually agreed to create a fiduciary relationship.
 {¶ 22} The negotiations between RPM and Oatey constituted business dealings between two separate entities and each party had the ability to protect its own interests. The evidence demonstrated that RPM routinely executed these types of agreements in an effort to protect the confidentiality of the information it disclosed. Although Oatey ultimately may have put itself in a superior competitive position by breaching the agreement, the terms of the contract did not put it there. The mutual understanding of the parties was that each was protecting its own interests in an arm's length business dealing.
 {¶ 23} Oatey simply agreed, under the terms of the contract, to keep the information confidential. Its duty was a contractual one. Damages for negligence are not recoverable in a contract action unless the defendant's conduct constitutes a breach of a duty that is separate and distinct from a breach of a contract duty. Gem Sav. Ass'n v. SterlingGold Properties, Ltd. (Oct. 2, 1992), 2d Dist. No. 12719, citing Bowmanv. Goldsmith Bros. Co. (Feb. 25, 1952), 8th Dist. No. 22298. Moreover, the fact that RPM felt the need to execute a written confidentiality agreement actually supports a conclusion that RPM was also under the impression that there was no fiduciary duty on Oatey's part, and that a written contract was necessary to protect RPM's interests. See GeneralUniversal Sys. v. Lee (C.A.5, 2004), 379 F.3d 131, 151, fn. 53 (reasoning that because the parties were contemplating executing a confidentiality agreement, there was no mutual understanding that they had a fiduciary relationship).
 {¶ 24} RPM further maintains that a fiduciary relationship arose because it disclosed confidential financial information to Gary with the understanding that he and Oatey would keep the information confidential. RPM cites cases, however, that fail to support its argument. For example, RPM quotes from a case from this court, in which we recognized that a confidential relationship may be implied where a trade secret is disclosed to a potential purchaser. See Releasomers, Inc. v. GoodyearTire Rubber Co. (Nov. 19, 1986), 9th Dist. No. 12535. The confidential relationship to which the case referred, however, was never equated with a fiduciary relationship; instead, it gave rise to a claim for misappropriation of trade secrets. See, also, Cloud v. Standard PackagingCorp. (C.A.7, 1967), 376 F.2d 384. Likewise, another case cited by RPM recognized that the disclosure of trade secrets might give rise to fiduciary duty, except that such a claim would not be cognizable in Indiana or Illinois because any claim for a breach of fiduciary duty on this basis had been displaced by the Uniform Trade Secrets Act. SeeVenango River Corp. v. Nipsco Indus., Inc. (Dec. 15, 1994), E.D.Ill. No. 92 C 2412. Effective July 20, 1994, Ohio also adopted the Uniform Trade Secrets Act. See R.C. 1333.67. Thus, applying the legal reasoning cited in RPM's own brief, even if the disclosure of trade secrets could create a fiduciary relationship, any claim for breach of that relationship has been displaced in Ohio by the Uniform Trade Secrets Act.
 {¶ 25} Because there was no evidence to establish that RPM had a cognizable claim against Oatey for breach of fiduciary duty, the trial court erred in failing to grant Oatey a directed verdict on that claim. Oatey's first and second assignments of error are sustained in part.
 Breach of Contract {¶ 26} First, Oatey contends that it was entitled to a directed verdict on RPM's breach of contract claim because RPM failed to prove that Oatey breached the terms of the agreement. There was no dispute in this case that Oatey signed a confidentiality agreement with RPM in January 1995, and that the terms of the agreement prohibited Oatey from sharing that information with Oatey's sales people and from using that information to gain a competitive advantage against PCI. The only dispute was whether Oatey had used the confidential information to prepare its winning Cotter bid, whether the use of that information is what enabled Oatey to be the successful bidder, and whether RPM incurred any damages as a result.
 {¶ 27} Although Oatey presented testimony that Gary Oatey had not disclosed the information, that no one at Oatey had used the confidential information to prepare the winning bid, and that Oatey's low price was not the only reason that Cotter chose Oatey as its new supplier of private label cement, RPM presented contradictory evidence on each of these points. There was evidence before the jury to support a reasonable conclusion that Oatey had breached the confidentiality agreement by using PCI's financial information to gain a competitive advantage in bidding against it on the Cotter account, and Oatey's use of the PCI financial information is why it was the successful bidder for the Cotter account.
 {¶ 28} According to the testimony of Frank Sullivan, RPM's chief financial officer, RPM owned thirty independent subsidiaries and was in the business of buying and selling companies in the paint and coatings industry. Sullivan explained that during the acquisition process, the owner of a prospective acquisition will often share confidential financial information to demonstrate how the business is performing. Before such information is shared, however, it is routine practice for the potential purchaser to sign a confidentiality agreement, agreeing to use the information only for the purpose of evaluating the company as a potential acquisition and to share the information only with those people within its company who participate in acquisition decisions. Sullivan explained that the reason for such an agreement is to prevent the misuse of the information in the competitive marketplace.
 {¶ 29} Initially, Sullivan gave Oatey only preliminary financial information about PCI, but, as the negotiations progressed, Sullivan disclosed more detailed information. When Gary asked to tour PCI's factory, Sullivan complied with the request only after Gary assured him that Oatey was genuinely interested in purchasing PCI. According to Sullivan, a tour of the factory was a "big step" in giving inside information about the workings of PCI.
 {¶ 30} After touring the PCI factory, Gary asked Sullivan for more detailed financial information about PCI, which Sullivan provided. That information included a breakdown of every item of factory overhead. According to Sullivan, this information was "highly revealing." He and other witnesses explained that this financial information gave an inside picture of the costs and competitive position of PCI, and could enable someone to isolate material costs as well as determine PCI's gross and net profit margins. RPM and PCI kept this information confidential and none of it could be determined from the marketplace.
 {¶ 31} By June 1995, Sullivan became impatient because Oatey still had not made an offer to purchase PCI and had not even discussed a purchase price. Sullivan believed that Oatey had all the information that it needed to make a decision, so he asked Gary to make an offer before the July meeting of RPM's board of directors. Gary indicated that he could not comply with that time frame. Gary never gave Sullivan a definite rejection, nor did he explain Oatey's failure to pursue negotiations for the acquisition of PCI. Sullivan, who had participated in hundreds of acquisition negotiations during his 12 years at RPM, explained that Gary's failure to communicate a rejection or an explanation for his failure to make an offer was somewhat unusual behavior in these types of dealings. At that point, Sullivan began to question whether Oatey ever had a sincere interest in purchasing PCI.
 {¶ 32} In January of 1996, after negotiations between Oatey and PCI had ceased, it was time to submit bids for the Cotter private label cement account. Cotter had actively solicited detailed bids from several manufacturers, something that it did not typically do. One witness explained that Cotter likely did that because it was aware of lower pricing in the market. PCI knew that it would have to reduce its prices, despite the fact that material costs had been increasing and it had been raising its prices recently. PCI submitted a bid that it thought was aggressive and PCI assumed that it would once again win the Cotter private label account, as it had done for 23 years. Approximately one month later, however, PCI was informed that its proposal had not been accepted. PCI later learned that Oatey had been the successful bidder.
 {¶ 33} Although Oatey attempted to convince the jury that it was a mere coincidence that it had been able to outbid PCI for the Cotter private label account, and that factors other than price led to it winning the account, there was ample evidence before the jury to convince it otherwise.
 {¶ 34} Perhaps RPM's most compelling evidence was the testimony of Dennis Cockayne, who had been an independent manufacturer's representative for Oatey at the time Oatey submitted its bid on the Cotter account. Sullivan's suspicions about Oatey were confirmed when Dennis Cockayne spoke to him and other PCI representatives at the Ace Hardware Trade Show. Cockayne told them that PCI had "been had" on the Cotter account, explaining that Gary Oatey and others at Oatey had bragged to him about having the information that Oatey needed to outbid PCI for the Cotter account. Cockayne also testified at trial that another Oatey executive had told him that Oatey had never been interested in purchasing PCI, but that it had received financial information that gave it insight into PCI's pricing.
 {¶ 35} Cockayne explained, to Sullivan at the trade show and in his testimony at trial, that for years, Oatey had been unable to figure out how PCI was repeatedly able to beat its competitive bids for the private label cement accounts until it got all of the cost information. Oatey thought that it had been bidding aggressively and, in fact, believed that it had the best price in the industry. Oatey lost private label bids to PCI year after year, however, apparently because Oatey was setting its profit margin far too high. After procuring the financial information about PCI, Oatey was able to put all the pieces together. As Cockayne explained at trial, it was like going into a football game and knowing every time what plays the other team was going to run.
 {¶ 36} Although Oatey's witnesses attempted to undermine the credibility of Cockayne, his testimony was partially corroborated by other evidence. Even Oatey witnesses conceded that Oatey was eager to capture a portion of the private label cement market but had been unable to do so. Several witnesses explained that, in the solvent cement industry, the private label cement accounts were far more lucrative than the name-brand accounts because the volume of business was much greater. Witnesses also explained that the only real growth in the industry was occurring in the private label segment. For several years, Oatey had tried to capture a segment of this market but had been unable to do so. One witness, who had been the executive vice president of sales at Oatey during 1995 and 1996, explained that, until it won the Cotter account, the vast majority of Oatey's cement business was in the brand-name segment of the market, which was not expanding. Although Oatey held the name-brand cement accounts at both Ace and Cotter, PCI's private label accounts at each were worth significantly more, at a ratio of about six to one. Oatey was admittedly very interested in capturing the private label portion of the market and its interest was intensifying.
 {¶ 37} Other witnesses also explained that Oatey had been unable to figure out how PCI kept outbidding it to win the private label accounts. PCI had held the private label Cotter account for 23 years and, although Oatey had bid against PCI many times before, it had never been able to outbid PCI. The sealed bidding in this industry was depicted as a very secretive process. Those who bid for an account never see the other bids, including the winning bid. In fact, RPM did not see Oatey's winning 1996 bid for the Cotter account until the civil discovery process in this lawsuit. PCI had been able to win the lucrative Cotter private label PVC cement account for 23 years, and Oatey had no idea what PCI's prices were or why Oatey had been unable to outbid PCI.
 {¶ 38} Apparently because the PCI financial information was not publicly available and its winning bids were never disclosed, Oatey had never been able to figure out how PCI kept outbidding it on the private label accounts. Oatey thought that it had the most competitive pricing in the industry and it spent years digging into why PCI kept beating its price bids. Oatey employees even compared the make-up of the two companies' products, under the assumption that PCI must have been selling an inferior product, for that could be the only way that PCI was beating Oatey's price.
 {¶ 39} PCI's cost information, including its profit margins, was likely the missing piece of the puzzle that Oatey needed. According to one witness, Oatey had not known what was an appropriate profit margin to use for the private label bid because it had very little private label business. Prior to January 1996, most of Oatey's cement business was in the name-brand market, where it was an industry leader. Consequently, Oatey had been submitting bids on private label accounts with an average profit margin of 40 to 50 percent, the same profit margin as its name-brand accounts. It apparently assumed that PCI was using similar profit margins. In its January 1996 Cotter bid, however, Oatey drastically reduced its private label profit margin to 30 percent.
 {¶ 40} Witnesses from RPM and Oatey testified that, during 1994 and 1995, the costs of materials needed to manufacture the solvent cement had been on the rise; that material costs represent a large portion of the production costs; and that, as a result, both Oatey and PCI had been repeatedly increasing the prices of their products to compensate for the increase in costs. PCI's price bids had been on the rise, as had Oatey's. Despite that fact, however, Oatey reduced its price for its January 1996 Cotter bid to lower than it had ever bid before.
 {¶ 41} There was also corroboration of Cockayne's testimony that Oatey had never really been interested in purchasing PCI. According to Frank Sullivan, Gary had told him that Oatey was interested in purchasing PCI and in visiting the factory because Oatey needed additional manufacturing capabilities. Other evidence demonstrated, however, that Oatey had plenty of manufacturing capacity and was able to easily meet the needs of the new Cotter private label account with the manufacturing capacity it had at that time.
 {¶ 42} Oatey had also attempted to establish that its reduction in price was not the only reason that it won the 1996 Cotter bid. Although Oatey did present evidence that price was not the only consideration in Cotter's selection of the winning bid, it was undisputed that price was one of the most important factors in the bidding process, that Oatey did beat PCI's price, and that Cotter would not have even considered Oatey's bid if it had not reduced its price. RPM also presented evidence that PCI had always given Cotter good service and had always had product on hand when Cotter needed it. Cotter's recent ratings of PCI on the service aspects of their business dealings had been high.
 {¶ 43} RPM's primary position on damages was that the loss of the Cotter account had a negative impact on the value of PCI and RPM sold PCI for much less than it had been worth prior to the loss of the Cotter account. RPM presented evidence that after Oatey indicated that it was not prepared to make an offer to purchase PCI, RPM hired a consultant to find a buyer. On February 26, 1996, Cookson Electronics valued PCI at $5,150,000 and made a tentative offer to purchase it for that amount. That was an acceptable price to RPM. Although there was evidence that Cookson did not make a firm offer to purchase PCI at that price, there was no dispute that Cookson had tentatively valued PCI in February 1996 at over $5 million.
 {¶ 44} In March, 1996, after Cookson learned that PCI had lost the Cotter account, it withdrew its offer. Cookson later offered $3.7 million for PCI, and RPM accepted that offer. Although seven companies had negotiated with RPM about buying PCI, Cookson was the only company that ever made an offer to purchase PCI.
 {¶ 45} It was the opinion of RPM's expert that Cookson had reduced its offer to purchase PCI by $1.4 million primarily due to PCI's loss of the Cotter account and that, as a result, Oatey's improper use of the confidential information to outbid PCI had caused RPM $1.4 million in damages. Oatey's witnesses insisted that RPM's damage figure was too high because it did not take into account the other reasons that Cookson had reduced the value of its offer to purchase PCI. In addition to the loss of the Cotter account, Cookson had reduced the value of its offer to purchase PCI due to environmental clean-up issues and the growth potential of the company.
 {¶ 46} There was no dispute, however, that the loss of the Cotter account had a negative impact on the value of PCI. Even a witness called by Oatey testified that the loss of a major account is a key factor in valuing a business. None of Oatey's witnesses, however, was able to quantify that impact. No one disputed that in 1995 or 1996, the Cotter private label cement account was worth approximately $1.5 million to $1.7 million and that the value of PCI was negatively impacted by the loss of that account.
 {¶ 47} Thus, there was evidence from which reasonable minds could conclude that Oatey breached the contract and that its breach caused RPM significant damages. After construing the evidence most strongly in favor of RPM, we cannot say that reasonable minds could only conclude that Oatey did not breach the agreement, that its breach did not cause PCI to lose the Cotter private label account, or that RPM was not damaged as a result. Thus, a directed verdict or judgment notwithstanding the verdict on the breach of contract claim would have been inappropriate. To this extent, Oatey's first and second assignments of error are overruled.
 {¶ 48} Finally, Oatey challenges a comment made by RPM's counsel during closing argument. As that comment would not constitute a basis for a directed verdict or judgment notwithstanding the evidence, this challenge is not properly raised here. Oatey should have, but did not, separately assigned error to counsel's comments during closing arguments, so we need not reach this issue. App.R. 12(A)(1)(b) and App.R. 12(A)(2).
 {¶ 49} Oatey's first and second assignments of error are overruled in part and sustained in part. Because Oatey failed to establish that the trial court committed reversible error in denying it a directed verdict or judgment notwithstanding the verdict on RPM's claims for misappropriation of trade secrets or breach of contract, the first and second assignments of error are overruled. Insofar as Oatey challenges the trial court's failure to grant a directed verdict and/or judgment notwithstanding the verdict on RPM's breach of fiduciary duty claim, the first and second assignments of error are sustained in part.
 ASSIGNMENT OF ERROR III
"The trial court erred by denying [Oatey's] motion for summary judgment."
 {¶ 50} Pursuant to Civ.R. 56(C), summary judgment is proper if:
 {¶ 51} "(1) [N]o genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing the evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the nonmoving party."State ex rel. Howard v. Ferreri (1994), 70 Ohio St.3d 587, 589.
 {¶ 52} All evidence must be construed in favor of the nonmovant. In ruling on a motion for summary judgment, the trial court is not permitted to weigh the evidence or choose among reasonable inferences. Dupler v.Mansfield Journal (1980), 64 Ohio St.2d 116, 121. Rather, the court must evaluate the evidence, taking all permissible inferences and resolving questions of credibility in favor of the non-moving party. Id.
 {¶ 53} In its one-half-page argument on appeal, Oatey contends that the trial court erred in denying its motion for summary judgment because the "undisputed facts" established that RPM did not control the trade secrets at issue, that no fiduciary duty existed between Oatey and RPM, and that there was no evidence that Oatey misappropriated any trade secrets or used the information to cause harm to RPM.
 {¶ 54} As RPM asserted in opposition to summary judgment and again on appeal, the material facts in this case were disputed and RPM had presented evidence to demonstrate the disputed nature of the facts. In fact, Oatey's argument on summary judgment even recognized that RPM had evidence to support most of the allegations in its complaint, but it attempted to discredit that evidence. Specifically, according to Oatey, the testimony of two RPM key witnesses, Dennis Cockayne and Frank Sullivan, was not credible. Oatey attempted to demonstrate the lack of credibility of this evidence by pointing to other evidence that "refuted" it. Oatey's attempts to discredit RPM's witnesses, however, only served to demonstrate that there were genuine issues of material fact. See B.F.Goodrich Co. v. Commercial Union Ins. Co., 9th Dist. No. 20936, 2002-Ohio-5033, ¶ 37. Accordingly, the trial court did not err in denying Oatey's motion for summary judgment. The third assignment of error is overruled.
 ASSIGNMENT OF ERROR IV
"The trial court abused its discretion by denying [Oatey's] motions for leave to amend its answer under [Civ.R. 15]."
 {¶ 55} Oatey contends that the trial court abused its discretion by denying its requests to amend its answer to raise as defenses that RPM had no standing and was not the real party in interest. Oatey contends that it moved to amend its answer, pursuant to Civ.R. 15(A), prior to trial and that it moved during trial, pursuant to Civ.R. 15(B), to conform the evidence to the pleadings to incorporate those additional defenses.
 {¶ 56} On August 20, 2001, Oatey moved the trial court, pursuant to Civ.R. 15(A), for leave to amend its answer to add the defenses of standing and real party in interest. Because Oatey had filed its answer and this action had been placed on the trial calendar, Civ.R. 15(A) provided for amendment only "by leave of court or by written consent of the adverse party. Leave of court shall be freely given when justice sorequires." (Emphasis added.) "[T]he decision whether to grant a motion for leave to amend a pleading under Civ.R. 15(A) is within the discretion of the trial court." Hoover v. Sumlin (1984), 12 Ohio St.3d 1, 6. An abuse of discretion is more than an error of judgment, but instead demonstrates "perversity of will, passion, prejudice, partiality, or moral delinquency." Pons v. Ohio State Med. Bd. (1993), 66 Ohio St.3d 619,621.
 {¶ 57} This case was originally filed on October 25, 1996. Since that time, and prior to requesting leave to amend its answer: (1) Oatey moved for, and was granted, summary judgment; (2) the trial court sua sponte vacated that order; (3) Oatey appealed to this court and we reversed and remanded; (4) RPM moved for, and obtained, relief from judgment; (5) Oatey again appealed to this court, but we affirmed the trial court's decision; (6) Oatey again moved for summary judgment; and (7) RPM filed its brief in opposition to Oatey's motion for summary judgment.
 {¶ 58} The defenses of standing and real party in interest are waived if not timely raised. See State ex rel. Tubbs Jones v. Suster (1998),84 Ohio St.3d 70, 78; Hang-Fu v. Halle Homes, Inc. (Aug. 10, 2000), 8th Dist. No. 76589. Given that this case had been pending for nearly five years, including two prior final judgments and appeals, before Oatey requested leave to amend its answer, we cannot say that the trial court abused its discretion by determining that this was not one of those situations "when justice so requires" that it grant a party leave to amend its pleading. See Civ.R. 15(A); Turner v. Cent. Local School Dist.
(1999), 85 Ohio St.3d 95, 99 (holding that the trial court abused its discretion in granting defendant's motion to amend its answer to add the defense of sovereign immunity after the case had been pending for almost three years including a prior motion for summary judgment and appeal up to the Supreme Court).
 {¶ 59} Moreover, even if the trial court erred by refusing to allow amendment of Oatey's answer, Oatey has failed to demonstrate that it was prejudiced thereby. The defenses of lack of standing and real party in interest that Oatey attempted to add pertained only to RPM's claim for misappropriation of trade secrets. As we emphasized in the disposition of Oatey's first and second assignments of error, the jury found in favor of RPM on that claim, but it awarded no damages. Thus, Oatey has failed to demonstrate that it was prejudiced by its inability to raise these defenses. The fourth assignment of error is overruled.
 ASSIGNMENT OF ERROR V
"The trial court erred in entering judgment for RPM in the amount of $420,000."
 {¶ 60} Through its fifth assignment of error, Oatey asserts that the trial court erred in aggregating the two $210,000 damage awards that the jury awarded for breach of contract and breach of fiduciary duty. Because we found merit in Oatey's argument that it should have been granted a directed verdict on RPM's breach of fiduciary duty claim, the judgment on that claim must be vacated on remand. As a result, the $210,000 damage award on that claim likewise must be vacated, rendering this assignment of error moot. Consequently, we need not reach the merits of this assigned error.
 ASSIGNMENT OF ERROR VI
"The trial court abused its discretion by granting RPM prejudgment interest on its breach of contract claim."
 {¶ 61} Next, Oatey argues that the trial court erred in awarding RPM prejudgment interest on the breach of contract claim. The trial court's authority to award prejudgment interest on a breach of contract claim is governed by R.C. 1343.03(A), which provides, in relevant part, that a creditor is entitled to interest at the statutory rate "when money becomes due and payable upon any * * * instrument of writing * * * and upon all judgments * * * of any judicial tribunal for the payment of money arising out of * * * a contract or other transaction[.]"[4]
 {¶ 62} Although Oatey asserts that the trial court abused its discretion in awarding prejudgment interest, it is actually asserting that the prejudgment interest award was outside of the trial court's authority under R.C. 1343.03(A) because the damages at issue in this case did not constitute money "due and payable" under a contract. See R.C.1343.03(A).
 {¶ 63} RPM asserted in the trial court, and again on appeal, that, because these damages arose from the breach of a contract, they constitute money "due and payable" on an instrument of writing. Oatey contended, however, that there was no money "due and payable" under the terms of this contract and, consequently, the trial court was without authority to award prejudgment interest on the breach of contract judgment. We agree.
 {¶ 64} Although the terms of R.C. 1343.03(A) clearly allow interest to run from every breach of contract judgment, prejudgment interest is not an entitlement in every breach of contract action. By the explicit terms of R.C. 1343.03(A), prejudgment interest is limited to those contracts that provide for a payment of money that the breaching party failed to pay. "[P]rejudgment interest under R.C. 1343.03(A) is based on the premise that a party to a contract should not retain the use of money owed under a contract when that amount is due and payable to the other contracting party." Kott Enterprises, LTD. v. Brady, 6th Dist. No. L-03-1342,2004-Ohio-7160, at ¶ 72, citing Miller v. Gunckle, 96 Ohio St.3d 359,2002-Ohio-4932, at ¶ 28 and Luft v. Perry Cty. Lumber Supply Co.,
10th Dist. No. 02AP-559, 2003-Ohio-2305, at ¶ 46.
 {¶ 65} Both RPM and the trial court relied heavily on the case ofRoyal Elec. Constr. Corp. v. Ohio State Univ. (1995), 73 Ohio St.3d 110, but that case did not even address the issue at hand. The "sole dispute" in that case was whether Royal was entitled to an award of prejudgment interest on the money it was due under the explicit terms of a contract, despite the fact that the amount of the debt was unliquidated or not reasonably capable of ascertainment. Id. at 114. Because Royal Electric had a contract with the state, the court construed R.C. 2743.18(A), but it looked to R.C. 1343.03(A) for guidance and, in the process, construed some of its language.
 {¶ 66} The sole focus of the court's statutory construction was on whether R.C. 1343.03(A) requires that a debt "due and payable" on a written instrument be certain or liquidated to support an award of prejudgment interest. Emphasizing that there is no language in either R.C. 2743.18(A) or R.C. 1343.03(A) that the debt be "liquidated" or "capable of ascertainment," the court refused to add such a requirement to the "plain language" of either statute. There was not a question in that case, however, as to whether there was in fact money owed under the explicit terms of that contract, for there clearly was. Thus, we are not persuaded by RPM's insistence that Royal Electric answers this question.
 {¶ 67} Prior to Royal Electric, there had been disagreement in this state as to whether a court has authority to award prejudgment interest under R.C. 1343.03(A) when the amount of the debt due under the contract was not ascertainable or liquidated prior to judgment. See, e.g., UnitedStates Playing Card Co. v. The Bicycle Club (1997), 119 Ohio App.3d 597,608-609; Mahon-Evans Realty, Inc. v. Spike (1986), 33 Ohio App.3d 268,270-271. Royal Electric ended that debate. There had never been any question, however, that there must in fact be a debt due under the terms of the contract for the prejudgment provision of R.C. 1343.03(A) to apply.
 {¶ 68} At issue here is the meaning of money "due and payable" on a written instrument. Undefined words used in a statute must be accorded their usual, normal, or customary meaning. State ex rel. Hawkins v.Pickaway Cty. Bd. of Elections (1996), 75 Ohio St.3d 275, 277. Webster's Third New International Dictionary (1993), 699, defines "due" to mean "owed or owing as a debt" and "having reached the date at which payment is required[.]" It defines "payable" as "requiring to be paid, * * * due," and "specifying payment to a particular payee * * * at a specified time or occasion * * * or in a particular manner[.]" Id. at 1659. The plain language of R.C. 1343.03(A) requires that RPM's entitlement to prejudgment interest (attaching to money due and payable on the written instrument) was dependent upon there being a debt due to it under the terms of the contract.
 {¶ 69} There was no debt due under this contract. The contract at issue provided that RPM would disclose to Oatey information about PCI and, in return, that Oatey would keep the information confidential and use it only for purposes of evaluating a potential acquisition of PCI. Had both parties fully performed under the agreement, and had there been no breach by Oatey, no money would have been exchanged by these parties. There was no "money due and payable" under the terms of the confidentiality agreement, and the prejudgment provisions of R.C.1343.03(A) did not apply. Consequently, the trial court had no authority to award prejudgment interest. The sixth assignment of error is sustained.
 {¶ 70} The first and second assignments of error are overruled in part and sustained in part, as detailed above. The sixth assignment of error is sustained. The fifth assignment of error was not addressed because it had been rendered moot by our disposition of the first and second assignments of error. The remaining assignments of error are overruled. The judgment of the Medina County Court of Common Pleas is affirmed in part and reversed in part and remanded to the trial court for the entry of judgment consistent with this opinion.
Judgment affirmed in part, reversed in part, and the cause remanded.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Medina, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to both parties equally.
Exceptions.
Whitmore, J. Concurs
[1] The appellants, when referred to together, will be collectively referred to as "Oatey."
[2] Oatey had moved for, and was granted, summary judgment but the trial court later sua sponte vacated that judgment. We reversed that judgment on appeal. See RPM, Inc. v. Oatey Co. (Dec. 9, 1998), 9th Dist. No. 2745-M, at 4. RPM later filed a motion for relief from judgment, which the trial court granted, and we affirmed that judgment on appeal. See RPM, Inc. v. Oatey Co. (Sept. 20, 2000), 9th Dist. No. 2960-M, at 6.
[3] RPM also asserted that Oatey had used the confidential information to prepare a competitive bid for the Ace Hardware private label account in August 1995 and that it did outbid PCI's price, but that PCI was able to keep the account by lowering its price. RPM apparently contended that it was damaged in the amount of the price reduction that was forced upon it by Oatey's low bid. Although RPM argued this point in its opening and closing arguments, it did not present evidence at trial that PCI reduced its price to Ace because a lower bid had been submitted by Oatey. Consequently, we will limit our discussion to the damages that allegedly flowed from the loss of the Cotter account.
[4] There is no dispute that RPM would be entitled to post-judgment interest under R.C. 1343.03(A) as there is money due and payable on a judgment for the payment of money damages arising out of a contract. The sole issue here is RPM's entitlement to prejudgment interest under R.C.1343.03(A).